***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Hall with minor modifications.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter pursuant to the North Carolina Workers' Compensation Act.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. At all times relevant to this claim, an Employer-Employee relationship existed between the Plaintiff and Defendant-Employer in that the Plaintiff was employed by Defendant-Employer on or about October 10, 1989.
4. On October 10, 1989, while Plaintiff was employed by Defendant-Employer, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
5. Plaintiff's average weekly wage at the time of injury was $280.22, yielding a compensation rate of $186.81.
6. Plaintiff has received temporary total disability benefits at the rate of $186.81 per week during all periods he has not worked for the Defendant-Employer. Temporary total disability benefits have been paid continuously since on or about November 4,1990.
7. All completed North Carolina Industrial Commission forms are admissible, without further identification or proof, and are entered into evidence.
8. The parties stipulated the following into evidence at the hearing before the Deputy Commissioner:
 a) Video tape from October 15, 2001 as Stipulated Exhibit 1A;
 b) Video tape from May 3, 2002 as Stipulated Exhibit 1B;
 c) Video tape from September 24, 2002 as Stipulated Exhibit 1C; *Page 3 
 d) Pertinent parts of Plaintiff's discovery response as Stipulated Exhibit 2;
 e) Two Form 90's as Stipulated Exhibit 3;
 f) A Form 19 as Stipulated Exhibit 4;
 g) Western Southern Life Notice of Absence from or Return to Work as Stipulated Exhibit 5;
 h) Western Southern Life Job Description (four-pages) as Stipulated Exhibit
 i) A joint report of two private investigators from HUB Enterprises regarding surveillance on October 15 and 16, November 21, 2001 and May 3-4, 6, 2002 as Defendant's Exhibit 1;
 j) An October 9, 2002 report from Icard Investigations regarding surveillance on September 24, 30, and October 9, 2002 as Defendant's Exhibit 2; and
 k) A list of tools Plaintiff was observed using by Icard Investigations in September 2002 as Defendant's Exhibit 3.
 9. Subsequent to the hearing before the Deputy Commissioner, the parties stipulated into evidence a set of Plaintiff's medical records and the vocational rehabilitation case management reports.
 10. The issues submitted by the parties for decision in the Pre-Trial Agreement before the Deputy Commissioner are incorporated herein by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 54 years old. Plaintiff has received his G.E.D.
2. Plaintiff began working for Defendants as a Sales Representative on January 30, 1984. This job involved soliciting and servicing insurance accounts in the local area. The related tasks included filling out forms and receipts, making and handling telephone calls and driving to visit clients. On visits to clients, Plaintiff also had to carry a small rate book and receipt book and occasionally climb stairs if necessary to reach certain clients. Plaintiff also has prior work experience in machine repair, manufacturing, furniture shops and construction and carpentry.
3. On October 10, 1989, Plaintiff was rear-ended as the last of four cars in a chain collision while driving on his client route. He was able to drive his car home from the accident. He informed Defendants of the accident the next day. He did not seek medical attention until two days after the accident, at which time he presented to Valdese General Hospital and was diagnosed with back strain. He was prescribed pain medication, but did not fill the prescription until the next day.
4. Plaintiff presented to a chiropractor, Dr. Zentner, with continued back complaints for a few weeks. He then presented to Dr. Donald Glugover, who prescribed physical therapy.
5. Plaintiff did not begin missing work until March 14, 1990. He presented to Dr. David Jones, a neurosurgeon, on referral on March 16, 1990, complaining of increased pain over the last three weeks, primarily in his lower back and right hip and leg. After examining Plaintiff and ordering various scans and tests, Dr. Jones could find no explanation for Plaintiff's ongoing pain and referred Plaintiff to Dr. Andrea Stutesman, a physiatrist, for evaluation. *Page 5 
6. Dr. Stutesman evaluated Plaintiff on April 20, 1990. Plaintiff described pain that was initially in the lower back and down into his legs, but had since moved and was running from the back of his neck down to his lower back and right buttock. Dr. Stutesman diagnosed left sacroiliac arthralgia and mild cervical sprain. She prescribed an anti-inflammatory steroid taper and a four-week rehabilitation program, after which she believed Plaintiff would be able to return to his job duties, including driving.
7. The work hardening program at the Rehab Center began on April 24, 1990. An FCE performed at the end of the program indicated that Plaintiff could perform medium-heavy work. The treatment team found that Plaintiff had reached maximum medical improvement upon discharge on May 25, 1990. Dr. Stutesman assigned a 0% permanent partial impairment rating as a result of the accident. Plaintiff was released to return to his job with Defendants without restrictions as of May 28, 1990.
8. Plaintiff returned to full duty work with Defendants on or about June 6, 1990.
9. Plaintiff returned to Dr. Jones on August 1, 1990 with complaints of continued right medial thigh pain. Additional examination and testing, including a lumbar myelogram and MRI, failed to reveal the source of the ongoing pain complaints. Dr. Jones discharged Plaintiff on November 5, 1990, with no further treatment to offer him. On or about November 23, 1990, Plaintiff requested that Dr. Jones provide a referral to Dr. Sean Maloney, a physiatrist.
10. Plaintiff first presented to Dr. Maloney, now at Wake Forest University Baptist Medical Center, on November 30, 1990, with complaints of persistent neck and back pain. Dr. Maloney removed Plaintiff from work and treated him regularly until May 20, 2003 when Defendants declined to pay for further treatment by him. Dr. Maloney's diagnoses of Plaintiff's conditions over the years included chronic neck and back pain, myofascial pain syndrome, sleep *Page 6 
disturbance, chronic fatigue, carpal tunnel syndrome, cervical spondylosis, degenerative disc disease, osteoarthritis, fibromyalgia, hyperuricemia, and gout. Dr. Maloney treated Plaintiff primarily with anti-inflammatory and gout medications and recommendations for exercise. In 1995, Dr. Maloney stated that Plaintiff had reached maximum medical improvement and ordered an FCE. He did not assign work restrictions or recommend a rehabilitation program.
11. In 1993, the Social Security Administration determined that Plaintiff was not permanently and totally disabled and rejected his application for benefits. Plaintiff did not appeal that determination.
12. Defendants' February 17, 2000 Form 60 accepted liability for the Plaintiff's alleged lower back strain.
13. In late 2000, Dr. Ted Waller of Boone Orthopaedic Associates evaluated Plaintiff for an eight-year history of left knee problems, which he attributed to kneeling only on his left knee due to right-side pain. On December 12, 2000, Dr. Waller performed left knee arthroscopy with a lateral retinacular release and an open excision of the prepatellar bursa, which revealed gouty tophaceous material (uric acid crystals) throughout the knee joint and in the prepatellar bursa. In a June 3, 2003 letter to Plaintiff's counsel, Dr. Waller related Plaintiff's left knee surgery to his gout, stating that it was unlikely that compensation for any right-side pain had caused or contributed to the problem.
14. Plaintiff was observed by three different private investigators in 2001 and 2002. On October 15 and 16, 2001, Plaintiff was observe driving, getting in and out of his car, walking, and helping someone at a hardware store load something into the back of Plaintiff's vehicle, standing, bending and carrying and using tools and a ladder, all without problem. On October 16, 2001, *Page 7 
Plaintiff was performing various carpentry and repair tasks on the property of a family member.
15. Defendant requested that Dr. Margaret Burke, a physiatrist, evaluate Plaintiff in December 2001. Plaintiff complained of pain in numerous locations, including the back of his head and neck, right shoulder, elbow and wrist, as well as down his back, over his right scapula, into his right leg, and around his right hip. Dr. Burke's impression was chronic, generalized myofascial pain, gout, and osteoarthritis of the left knee. She stated that the etiology of Plaintiff's symptoms had no objective basis, though a portion of his complaints related to gout and arthritis. Dr. Burke believed Plaintiff had been at maximum medical improvement for ten years and she declined to assign a permanent partial disability rating based on the 1989 accident. She felt that Plaintiff could return to his Sale Representative position, especially if driving was limited. She stated that Plaintiff had no restrictions associated with the 1989 accident. She felt Plaintiff might benefit from myofascial release or other therapy, but did not relate any need for ongoing treatment to the 1989 accident.
16. On April 1, 2002, Plaintiff completed a Form 90 Report of Earnings indicating that he had not earned any wages for work since December 4, 1990.
17. On May 3, 2002, Plaintiff was observed working at the home of his family member again. He walked normally back and forth between his truck, the garage, and the house, often taking wood he had cut on a table saw into the house. He also did some bending and lifting, carried and used a ladder, and did overhead work all without apparent difficulty. On May 6, 2002, the investigator learned from Plaintiff's family member that he did electrical, plumbing and carpentry work and was backed up with jobs and was very busy. Plaintiff was paid according to the size of the job and the time involved. *Page 8 
18. On September 24, 2002, Plaintiff was observed using a weed eater in his yard and the yards of two neighbors for about an hour. Plaintiff also used a hose to clean his sidewalk, did some bending and lifting, and carried a drill and some lumber behind his house. On September 30, 2002, Plaintiff worked on his family member's barn for almost six consecutive hours installing latches on the doors, building shelves, and sanding various objects. That day, Plaintiff got in and out of his truck, walked, bent over, lifted, and used multiple tools that day. An extensive list of the tools Plaintiff used that day was received into evidence. All this work was done without apparent difficulty.
19. On November 6, 2002, Defendants filed a Form 24 Application to Terminate Payment of Disability benefits to Plaintiff based on his release to unrestricted work, his ability to work, and his actual return to work. After a December 11, 2002 informal telephonic hearing, Special Deputy Commissioner Elizabeth M. Maddox referred the matter for a full evidentiary hearing. Defendants filed a Form 33 on February 18, 2003.
20. Mr. Jim Ratliff, a certified rehabilitation consultant with Carolina Case Management, was assigned to provide vocational rehabilitation services to Plaintiff beginning in March 2003.
21. Plaintiff presented to Dr. Ralph Maxy for an Independent Medical Evaluation in April 2003. He complained of occasional neck pain with tingling and numbness in both arms and low back pain radiating into his right hip and down his leg to the foot and occasionally into the groin. After a physical examination, review of the medical records and history, and viewing of the surveillance videos, Dr. Maxy stated that Plaintiff probably sustained cervical and lumbar strains in the 1989 accident, but had long since recovered from them. Dr. Maxy felt that Plaintiff had reached maximum medical improvement from the 1989 accident and assigned a 0% *Page 9 
permanent impairment rating. Dr. Maxy opined that Plaintiff could return to full duty work with no restrictions.
22. On May 10, 2003, Plaintiff executed a Form 90 indicating that he had earned approximately $250.00 doing work for his niece since April 1, 2002.
23. On May 16, 2003, Defendants filed another Form 24 requesting permission to terminate Plaintiff's benefits based on his release to unrestricted work by Dr. Maxy. After an informal telephonic hearing, Special Deputy Commissioner Maddox referred the matter for a full evidentiary hearing.
24. On July 3, 2003, Defendants filed a Motion to Compel Plaintiff's Compliance with Vocational Rehabilitation, presenting evidence of Plaintiff's poor attitude and sabotage of the vocational rehabilitation process. Executive Secretary Tracey Weaver granted the Motion and entered Orders to Compel on August 6 and October 6, 2003.
25. At the hearing before the Deputy Commissioner, Plaintiff testified that he had been in moderate to severe pain since 1990, could do very little on a daily basis, and could not hold down a full-time job. Plaintiff is not credible and his testimony on the issues of causation and disability are accorded no weight.
26. On October 3, 2003, Defendants filed another Form 24 requesting permission to suspend the Plaintiff's benefits for violation of the Order compelling him to comply with vocational rehabilitation. After a telephonic hearing, the Deputy Commissioner entered an Administrative Decision and Order allowing Defendants to suspend the payment of disability benefits from October 3, 2003, until Plaintiff showed a willingness to cooperate with vocational rehabilitation. *Page 10 
27. The parties deposed Dr. Maloney on December 31, 2003 and February 20, 2004. In his deposition, Dr. Maloney related Plaintiff's ongoing complaints to his arthritis, myofascial pain syndrome, and gout, all of which he stated were caused or aggravated by the 1989 accident. He agreed that Plaintiff had reached maximum medical improvement and assigned a 10% permanent partial disability rating to Plaintiff's back as a result of the 1989 accident. He felt that Plaintiff required ongoing treatment related to the accident in the form of continued medications for pain and gout. Dr. Maloney did not want to opine on whether Plaintiff was disabled from work. He felt that whether Plaintiff could perform the activities observed during surveillance on a daily basis was a "non-medical" or "vocational" issue. Dr. Maloney's opinion of Plaintiff's condition was contradicted by the medical evidence from five other doctors, as well as certain medical texts admitted into evidence. Dr. Maloney's testimony was not credible and his opinion is afforded no weight in this case.
28. A June 29, 2004 Motion to Reinstate Benefits filed by Plaintiff was denied by the Deputy Commissioner based on further evidence of continued noncompliance with vocational rehabilitation by Plaintiff.
29. On August 12, 2004, Dr. Kern Carlton performed an Independent Medical Evaluation of Plaintiff. He stated that any strain symptoms from the accident should have resolved by that time and the current primary symptoms were related to spondylosis. He felt that Plaintiff was at maximum medical improvement and recommended an updated FCE for use in continuing vocational efforts. He could not assign a permanent partial disability rating based on the accident. Dr. Carlton recommended an updated FCE, but felt that Plaintiff could at least return to light duty level work. Dr. Carlton also stated that he could not relate any restrictions an FCE might reveal to the 1989 accident with a reasonable degree of medical probability. At his *Page 11 
August 25, 2004 deposition, Dr. Carlton testified that he saw no signs of discomfort on the videos and felt that Plaintiff's activities as shown by the surveillance were not consistent with his claim of severe chronic pain since 1989. Dr. Carlton opined that if Plaintiff in fact had chronic pain, it was probable that the pain related to his spondylosis which "may have" been aggravated by the accident. He was less than 50% certain of any such aggravation. Dr. Carlton testified that any further pain management required for Plaintiff's pain complaints might be related to the 1989 accident, but he could not testify to a casual link with a reasonable degree of medical probability.
30. In his September 7, 2004 deposition, Dr. Maxy was of the opinion that the Plaintiff's x-rays films and other scans taken since 1990 revealed only age-appropriate changes and did not support a diagnosis of chronic neck and back pain. Furthermore, Dr. Maxy indicated that he would have expected to find greater limitations in a chronic pain patient than the few symptoms Plaintiff exhibited on physical examination. Dr. Maxy saw no evidence of discomfort or limitation in Plaintiff as he performed the wide variety of tasks shown on the videotapes. He would have expected to see something revealing the effects of Plaintiff's alleged chronic pain. Dr. Maxy found no objective evidence to support Plaintiff's claim of ongoing pain related to the 1989 accident and he felt that the Plaintiff's subjective claims were not credible. He also disagreed with Dr. Maloney's assessment and testified that Dr. Maloney's opinion that Plaintiff's various conditions, including gout, degenerative disc disease, and myofascial pain syndrome were intertwined was not medically sound. Dr. Maxy indicated that Plaintiff needed no further medical treatment for any condition related to the 1989 accident.
31. As of his September 8, 2004 deposition, Mr. Ratliff had met with the Plaintiff 52 times. He testified that at every meeting, Plaintiff had stated he was too disabled to work. *Page 12 
Plaintiff indicated no interest in any line of work and did not want to develop a resume or job seeking skills. Plaintiff contacted 157 out of 244 viable job leads provided to him. However, the quality of those contacts is questionable due to Plaintiff's lack of effort and interest in the job search process. Aside from not completing applications properly, Plaintiff has told prospective employers that he was meeting with them to fulfill a requirement. He has refused to stay for interviews or omitted his contact information from applications. He has also indicated to prospective employers that he had restrictions that disqualified him from open positions. Out of 280 independent employer contacts assigned, Plaintiff reported making only 59. Mr. Ratliff gave his professional opinion that given Plaintiff's education, skills, and lack of restrictions, it was reasonably likely that he would have returned to work by now had he diligently sought employment.
32. Plaintiff sustained a compensable back strain in the 1989 accident. However, he reached maximum medical improvement from this strain in 1990. He sustained a 0% permanent partial impairment as a result of the accident and no longer suffers any effects from the 1989 injury that disable him from work or require ongoing medical treatment. These findings are supported by the combined credible medical evidence from five physicians. Dr. Maloney's opinions on these issues are accorded no weight because they are based primarily on Plaintiff's unreliable, subjective pain complaints and questionable medical theories relating hyperuricemia and gout to myofascial pain syndrome.
33. Plaintiff has failed to carry his burden of proof on the issue of disability. The credible medical evidence does not indicate that Plaintiff is disabled from any and all work by the 1989 accident. Plaintiff refused to participate adequately in the job search process and has thus not shown that he made reasonable, but unsuccessful efforts to find a job. Plaintiff has good *Page 13 
transferable skills, his GED, and no disabling medical conditions. Plaintiff has failed to show that a job search would be futile due to any combination of such factors. Plaintiff also did not present evidence that he had applied for jobs in the job market and only found jobs that earned less than his average weekly wage at the time of the accident in 1989. The vocational counselor presented numerous viable job leads for suitable work to Plaintiff and he unreasonably failed to take advantage of the vocational services.
34. Based on credible medical evidence from Dr. Waller and certain other physicians, Plaintiff's left knee surgery resulted from his gout condition. Plaintiff's gout was not caused or materially aggravated by the 1989 accident. Therefore, the left knee surgery and treatment was not a direct or indirect result of the 1989 accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident on October 10, 1989. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff failed to produce sufficient credible evidence to prove a relationship between his current health problems, including gout, and the 1989 compensable accident by a preponderance of the evidence. Plaintiff's current health problems are not compensable. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff failed to produce sufficient credible evidence to prove a relationship between his left knee problems and the 1989 compensable accident. The left knee problem and resulting surgery and other medical treatment are not compensable. N.C. Gen. Stat. § 97-2(6). *Page 14 
4. Plaintiff failed to produce sufficient credible evidence to prove that he is currently disabled by any injury or medical condition related to the compensable 1989 accident. See Sims v. Charmes/Arby's RoastBeef, 142 N.C. App. 154, 159-60, 542 S.E.2d 277, 282 (2001); N.C. Gen. Stat. § 97-2(9). He also failed to prove disability by any other accepted means that would make his continued unemployment compensable. See Russell v. Lowes Product Distribution, 108 N.C. App. 762, 765,425 S.E.2d 454, 457 (1993).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for additional temporary total disability benefits is hereby DENIED.
2. Plaintiff's claim for additional medical compensation is hereby DENIED.
3. Plaintiff's claim for medical compensation for his left knee problems and surgery is hereby DENIED.
4. Defendants are not obligated to provide further vocational rehabilitation benefits to Plaintiff.
5. Each side shall pay their own costs.
This 1st day of February 2007.
S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 15 
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER *Page 1